## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CYNTHIA MAGDZIAK,

        Plaintiff,                           Case No. 2:11-cv-15632
                                             Hon. Gerald E. Rosen

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.

_____/

## OPINION AND ORDER REVERSING
## <u>ADMINISTRATOR'S DENIAL OF LONG TERM RETIREMENT BENEFITS</u>

## I.  <u>INTRODUCTION</u>

      In this suit, Plaintiff Cynthia Magdziak challenges the decision of the Defendant claims administrator, Metropolitan Life Insurance Company, to deny her long-term disability ("LTD") benefits under a plan sponsored by her employer, Northwest Airlines. This Court's subject matter jurisdiction rests upon Plaintiff's claim for benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

      The case is presently before the Court on cross-motions for summary judgment to affirm or reverse the Plan's decision on the administrative record.  However, summary judgment is inapposite in ERISA cases.  *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  "Because this court's precedents preclude an ERISA

action from being heard by the district court as a regular bench trial, it makes little sense to deal with such an action by engaging a procedure designed solely to determine whether there is a genuine issue for trial." *Id.* (internal quotations omitted). Rather, this Court should "conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly." *Id.* But where, as here, the ERISA plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" the arbitrary and capricious standard applies to its decisions. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged decision, although they disagree somewhat as to the degree of deference owed to Defendant under this standard. Nonetheless, Plaintiff maintains that the Plan's decision must be overturned, even under a deferential standard of review, "[i]nsofar as Defendant relied on restrictions that restrict any form of gainful employment, yet asserted that Plaintiff was employable in a sedentary position within her training and experience." In other words, Plaintiff claims that her injury precludes her from pursuing "any" gainful employment within her training and experience, and that Defendant's conclusion to the contrary was incorrect.

Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decision-making process. Accordingly, the Court will decide Defendant's motion

"on the briefs."  *See* Local Rule 7.2(d).  This opinion and order sets forth the Court's

findings of fact and conclusions of law.  To the extent that any findings of fact constitute

conclusions of law, they are adopted as such.  To the extent that any conclusions of law

constitute findings of fact, they are so adopted.

## II.  <u>FINDINGS OF FACT</u>

In 1996, Plaintiff began working as a baggage handler at Northwest Airlines.  She

suffered an injury to her cervical spine in 2003 and underwent surgery to fuse her C5-C6

vertebrate.  She returned to work, but was reinjured on March 2, 2007, when she was hit

in the head with a metal rod.  (AR 751).  She continued to work until July 15, 2007, (AR

408), at which point left-side neck pain combined with intermittent numbness and pain in

both arms prevented her from continuing at her job.  (AR 436).  On July 17, 2007,

Plaintiff began receiving short-term disability benefits under Northwest Airline's Long

Term Disability Benefits plan ("Plan"), which is both funded and administered by

Defendant Metropolitan Life Corporation.

### A.    The Pertinent Plan Provisions

Under the Plan, LTD benefits are payable in three separate time frames.  Initially,

an employee is eligible to receive LTD benefits during the Elimination Period (in this

case, 90 days) if she can demonstrate that she is (i) receiving appropriate care and (ii)

unable to earn 80% of her predisability earnings at her own job.  Following the

Elimination Period, an employee may receive LTD benefits for an additional 36 months by satisfying the same criteria.  However, to continue receiving LTD benefits beyond the 36 month time frame, Plaintiff must demonstrate that she was unable to earn more than 80% of her predisability earnings from "*any employer* in Your Local Economy at *any gainful occupation* for which You are reasonably qualified taking into account Your training, education and experience."  (AR 365).

**B.      Plaintiff Received LTD benefits for 36 Months in accordance with the Plan**

In anticipation of the end of her Elimination Period, Plaintiff applied for LTD benefits on October 20, 2007.  She also applied for Social Security Disability Insurance Benefits.  Plaintiff's application for LTD benefits was approved, and her 36 month LTD benefits period began on November 1, 2007.  In a letter dated December 10, 2007, Defendant informed Plaintiff that after 36 months, the definition of "Disabled or Disability" under the plan would change to require a showing that she was unable to earn more than 80% of her predisability earnings from "*any employer* in Your Local Economy at *any gainful occupation* for which You are reasonably qualified taking into account Your training, education and experience."  (AR 365).

On March 31, 2008, Plaintiff completed a Functional Capacity Evaluation ("FCE"), which demonstrated that while Plaintiff had the capacity to perform work in the "Light Medium - Medium" demand category, she was not capable of continuing to perform as a baggage handler.  (AR 701-709).  Because she was not able to perform her

4

current job, this evaluation confirmed that Plaintiff was eligible for LTD benefits under the 36 month plan.  However, it did not necessarily mean she would remain eligible once the 36 month period expired.

One month later, the Social Security Administration ("SSA") denied Plaintiff's claim for Disability Insurance Benefits, stating that her "condition was not severe enough to keep her from working" and that she "can do work that involves only light lifting or exertion and does not require overhead reaching."  (AR 693-696).

For the next year, Plaintiff underwent physical therapy and received epidural steroid injections to treat her pain.  However, the C5-C6 disc in her neck collapsed in the Spring of 2009, forcing Plaintiff to undergo surgery.  On May 13, 2009, Dr. Kurz removed the plate from C5-C6 -- which had been fused in 2007 -- and added a plate at C6-C7 using some donor bone.  (AR 409, 436-437).  Following surgery, Plaintiff attended regular examinations with Dr. Kurz.  Although Plaintiff initially showed slow improvement in her cervical motion, her improvement eventually stalled.  (AR 509).  On October 1, 2009, Dr. Kurz determined that Plaintiff was permanently restricted from working as a baggage handler.  (AR 510).  At Plaintiff's November 10, 2009 examination, Dr. Kurz reported that while the x-rays looked good, Plaintiff had only regained about 60% of normal cervical motion.  (AR 509).

5

**C.    Review of Plaintiff's Claim Prior to End of 36 Month Period**

On March 6, 2010, Defendant sent a letter to Plaintiff, reminding her that she must demonstrate an inability to earn more that 80% of her predisability earnings from "any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience" to continue receiving LTD benefits beyond October 31, 2010.  (AR 501).  On April 13, 2010, Defendant received notice that the SSA upheld its denial of Plaintiff's disability claim.  (486-493).  In affirming its denial of disability benefits, the SSA stated that "her restrictions are consistent with the ability to perform sedentary work."  (AR 486-493).

On May 6, 2010, HealthFirst Imaging Center performed a CT Scan of Plaintiff's cervical spine, observing that "[t]he plate and screws appear in good position.  No subluxation or fracture is identified.  There is no gross disc herniation, central canal or foraminal stenosis."  (AR 486-493).  Dr. Kurz's May 11, 2010 examination confirmed that the surgery appeared solid, but noted that Plaintiff "has on and off neck pain.  It is really not a lot better in the last few months."  (AR 466).  In addition to referring Plaintiff to Dr. Sikorski to treat her pain, (AR 471), he observed that "cervical motion is still limited."  (*Id.*).  Importantly, the May 11, 2010 report opined that "Patient is permanently disabled from work as a luggage handler" and that any work or activity should involve "Limited bending, stooping, lifting.  No over shoulder work."  (AR 471-472).

By September 15, 2010 -- a month and a half before her LTD benefits were scheduled to expire -- Dr. Sikorski observed that although Plaintiff "continues to

6

complain of neck and upper shoulder pain," she displayed "good cervical range of motion, some mild increased pain with cervical extension." (AR 449). Dr. Kurz's October 19, 2010 report, however, noted that although "her neck pain has been under control with new medications," her "cervical motion remained the same." (AR 446). Dr. Kurz recommended Plaintiff "give it four more weeks," at which point he would "recommend an EMG of both upper extremities to rule out an ulnar neuropathy versus cervical radiculopathy." (AR 446).

**D.    Defendant's Denial of LTD benefits**

**1.    Employability Assessment and Labor Market Analysis (LMA) Report**

To evaluate Plaintiff's claim, Defendant had James F. Merline MS, CRC -- an in-house Vocational Rehabilitation Consultant -- review Plaintiff's medical history to determine whether she was "disabled from any and all occupations for which she is qualified based on her education, training and experience," as required for continuing coverage under the policy. (AR 440). Relying on Plaintiff's physical restrictions -- as documented by her physicians, the March 2008 Functional Capacity Evaluation ("FCE"), and the Social Security Administration's ("SSA") decisions -- and her past employment, education and training, Merline determined that Plaintiff "should be able to perform at the light level of physical exertion as defined by the U.S. Labor Department." (AR 440-441). Merline's report identified three potential occupations -- Wire Harness Assembler, Electronics Assembler, and Electronics tester -- for which Plaintiff was qualified. It also

7

indicated that opportunities within these professions (i) paid at least 80% of Plaintiff's predisability earnings and (ii) were within Plaintiff's local labor market, defined as within a 50 mile radius of Plaintiff's home.  (AR 442).

A major caveat to the recommendation, however, was that the "upper extremity paresthesias that have been reported are not [subsequently] determined to be objectively diagnosed as radiculopathy/neuropathy,"[1] because such a diagnosis "would complicate the overall picture and may precipitate further interventions that could delay efforts to establish stable R/L's [restrictions and limitations]."  (AR 440-441) (clarification added).

### 2. Denial of Plaintiff's Claim

Based on Merline's LMA report and the evidence provided by Plaintiff's physicians, as well as the SSA's denial of disability benefits and the March 2008 FCE, Defendant denied LTD benefits beyond December 23, 2010.  (AR 436-439).

---

[1] "Radiculopathy" is a "disease of the nerve roots."  As pertinent to this case, "Cervical radiculopathy" is "radiculopathy of cervical nerve roots, often manifesting as neck or shoulder pain."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007).

8

E.      **Plaintiff's Appeal**

On March 16, 2011, Plaintiff appealed Defendant's decision to discontinue LTD

benefits and submitted additional records from her physicians to support her claim that

she was not qualified and capable of making 80% of her predisability salary in any

occupation within her local labor market.  Specifically, Plaintiff submitted a report from

Dr. Kurz, dated March 15, 2011, which stated that Plaintiff could not perform the job of

Cable Assembler -- as recommended by Merline -- because it might require "prolonged

neck flexion."  (AR 372; 422).  The report further indicated that her "cervical range of

motion is only about 60-75% of normal."  (AR 372).  Dr. Sikorski's notes contained

similar observations, stating that Plaintiff's "range of motion is restricted in the cervical

spine," (AR 374), and that his impression was that Plaintiff has "Cervical degenerative

disc disease."  (AR 375).  Additionally, Dr. Sikorski recommended that Plaintiff undergo

an additional FCE to evaluate her post-surgery physical capacity.  (AR 374).

F.      **Defendant's Evaluation of Plaintiff's Appeal**

1.      **Dr. Marion's Evaluation**

In response to Plaintiff's appeal, Defendant referred the entire case to Dr. Philip

Marion, M.D., M.S., M.P.H., who evaluated the file and issued two reports on Plaintiff's

physical capabilities.  However, at no point did Dr. Marion personally examine the

Plaintiff.

9

Dr. Marion's first report, issued on April 13, 2011, confirmed that Plaintiff's "well-documented cervical spine impairment supports the permanent restriction of a light capacity occupation," and detailed the types of activities which fit that description. (AR 408-413). He also spoke with Dr. Kurz on April 12, 2011. During that conversation, Dr. Kurz declined to elaborate on specific occupational restrictions or limitations, but stated that "the patient reports she can not tolerate 'prolonged activities.'" (AR 411).

Additionally, the report responded to several questions posed by Defendant, one of which asked, "Are the results of the FCE consistent with the clinical findings?" (AR 412). Dr. Marion reviewed the March 2008 FCE and stated that the "testing was valid and the FCE determination was consistent with the clinical findings." (AR 412-413). However, he cautioned that "this FCE was performed in 2008 which was approximately one year prior to her more recent cervical spine surgery in 2009" and concluded that the "2008 FCE may not be an accurate assessment of her current functional capacity." (AR 413).

Dr. Marion supplemented this report on April 25, 2011, specifically to address Dr. Kurz's March 15, 2011 concern that Plaintiff was unable to perform activities requiring prolonged neck flexion. The amendment to his earlier report stated as follows: "patient should not be required to perform prolonged neck flexion. . . . [A]uthor recommends neck flexion positioning no more than on an occasional basis." (AR 405). Despite this new information, Dr. Marion maintained that "[t]he prior light capacity restrictions as outlined in the original report are otherwise without change." (AR 405).

10

2.      **CorVel Corporation's Employability Analysis and Labor Market Analysis (LMA)**

Because Plaintiff's medical records indicated that she could not perform any tasks requiring neck flexion, Defendant was forced to disregard Merline's earlier LMA and conduct a new analysis.  (AR 382) ("a previous Employability Assessment was conducted by MetLife and alternate occupations such as wire assembler . . . , Electronics Assembler . . . , and Electronic Tester . . . were identified.  However, after further review, it was opined that these assembly occupations would require prolonged/frequent neck flexion, which would not be within Ms. Magdziak's restrictions.  Therefore a second analysis was requested.").  Defendant retained Renee Lange, MS, CRC, a Vocational Rehabilitation Consultant with CorVel Corporation, to conduct the second LMA, which she submitted on May 20, 2011.  (AR 381-383).

In her analysis, Lange considered Plaintiff's "underlying cervical spine degenerative disease," the restrictions placed on her ability to work as outlined in Dr. Marion's report, her inability to perform any job requiring more than occasional neck flexion, and her education and employment history.  (AR 381).  Despite rejecting the occupations recommended in the Merline report, Lange identified three additional occupations -- Riveting Machine Operator, Machine Assembler, and Nicking Machine Operator -- that fit Plaintiff's physical capabilities, skill level, and earnings requirement.  (AR 382).  Lange also determined that such positions existed in Plaintiff's local economy, but did not provide any specific information on how she made this determination beyond

11

the use of "various job sites on the Internet including Simply Hired and Career Builder." (AR 382).

On July 14, 2011, however, Lange revised her opinion, noting that the position of Machine Assembler may require prolonged neck flexion, and was therefore unsuitable for Plaintiff. (AR 614). Despite this, she asserted that the other two positions -- Riveting Machine Operator and Nicking Machine Operator -- remained consistent with Plaintiff's physical restrictions and salary requirements.

### 3.      Plaintiff Supplemented her Appeal with Additional Medical Information on May 24, 2011

On May 24, 2011 -- four days after MetLife received Lange's LMA -- Plaintiff submitted additional medical record reflecting her most recent visits to Doctors Kurz and Sikorski. (AR 371-379). Beyond reiterating that Plaintiff's cervical motion was "only about 60-75% of normal," Dr. Kurz's report diagnosed Plaintiff with "Low grade cervical radiculopathy." (AR 372).

One of Defendant's internal clinician's evaluated this additional information and found that it failed to produce "any new clinical findings and would not impact prior . . . review assessment as relates to the period in question which is continuously from 12/24/10 onward. Addendum review is not warranted." (AR 355-56).

### G.      Defendant Denied Plaintiff's Appeal on June 17, 2011

12

Defendant denied Plaintiff's appeal on June 17, 2011, stating that "[t]he information does not contain clinical findings which corroborate restrictions or limitations that would preclude your client's ability to perform any gainful occupation, consistent with the alternative occupations that were identified by the vocational consultant on May 23, 2011." (AR 369).

Plaintiff filed suit in the Circuit Court of Wayne County on November 23, 2011. Defendant removed this action to this Court under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(e)(1), which vests the federal courts with exclusive jurisdiction of such matters. Both parties have filed motions for summary judgment.

## III.  CONCLUSIONS OF LAW

### A.    The Standards Governing the Parties' Cross-Motions

A participant in or beneficiary of an ERISA qualified plan may bring suit in federal district court to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).

13

Here, the parties agree that the "arbitrary and capricious" standard governs the Court's review, in light of the Plan provision that confers upon the claims administrator the authority "to interpret and administer the provisions of the plan." (AR 76). This standard is highly deferential: "A plan administrator's decision will not be deemed arbitrary and capricious so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005) (quoting *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990)). The Court must decide whether the Plan administrator's decision was "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). Finally, the Sixth Circuit has explained that even though the standard is deferential, it is not "inconsequential." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Id.*

Plaintiff argues in her Motion for Judgment on the Administrative Record that the Court's deferential review should further be tempered by the existence of a conflict of interest, where the Plan is both funded and administered by Defendant. The Sixth Circuit has instructed that where a plan sponsor bears the risk of paying claims and also appoints the body as the final arbiter of such claims, district courts should be particularly vigilant in reviewing the administrative record, *see University Hospitals of Cleveland*, 202 F.3d

14

839, 847 (6th Cir. 2000), and that such an inherent conflict of interest should be taken into account as a factor in determining whether the administrator's decision was arbitrary and capricious. *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527-28 (6th Cir. 2003), *overruled on other grounds*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

Finally, in reviewing Defendant's decision, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." *Wilkins*, 150 F.3d at 615, 619. The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its initial decision, but also includes materials considered during the administrative appeals process. *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).

**B.     Defendant's Denial of Disability Retirement Benefits Must be Reversed because it Arbitrarily Determined that Plaintiff is Capable of Light Work**

Defendant's decision to deny LTD benefits was arbitrary and capricious because it selectively credited beneficial evidence and opinions while rejecting contrary evidence without sufficient explanation. A decision is not arbitrary and capricious if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Judge v. Metropolitan Life Insurance Co.*, 2011 WL 6740748, at *1, *3 (E.D. Mich. Dec. 22, 2011) (Borman, J.). In other words, "the administrator's claim [decision] can be overturned only upon a showing of internal inconsistency, bad faith, or some similar

ground." *Racknor v. First Allmerica Financial Life Insurance Company*, 71 F. Supp. 2d 723, 729 (E.D. Mich. 1999). However, "an administrator abuses its discretion when it engages in a 'selective review of the administrative record' to justify a decision" to deny coverage. *Dockery v. USG Corporation Retirement Plan*, Case No. 08-13249, 2009 WL 2960471, at *1, *11 (E.D. Mich. Sept. 11, 2009) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. at 834.

While Defendant's ultimate decision is whether to either deny or grant coverage, that decision is the result of two preliminary questions: first, what level of work is Plaintiff capable of performing; and second, whether such work is available to Plaintiff in her local market at a sufficient wage. Because Defendant's determination of the first question was arbitrary, its analysis of the second question and resolution of the ultimate issue are likewise arbitrary. Specifically, Defendant has failed to provide any evidentiary basis for rationally determining that Plaintiff was capable of "Light work," when the evidence was equally suggestive of a "Sedentary work" classification. Consequently, Defendant's denial of LTD benefits must be reversed.

**1.    Defendant's Initial Denial of LTD Benefits was Arbitrary as it Relied on Irrelevant Evidence and Ignored Evidence Suggesting that Plaintiff was Incapable of Light Work**

Defendant's December 23, 2010 letter denying LTD benefits referenced two sources as the basis for its determination that Plaintiff was capable of Light work: (i) Dr. Kurz's March 2008 Functional Capacity Evaluation ("FCE") and (ii) the notes from

16

Plaintiff's October 7, 2010 appointment with Dr. Sikorski. (AR 437). Reliance on the March 2008 FCE fails because it is irrelevant to the determination of Plaintiff's post-surgery physical capabilities, while reliance on Dr. Sikorski's October 7 evaluation -- or, more accurately, reliance on select language from Dr. Sikorski's October 7 evaluation -- fails because that evaluation provides no evidence establishing that Plaintiff is capable of "Light work," particularly when viewed alongside other, contradictory, evidence.

Beginning with the March 2008 FCE, there is no doubt that Plaintiff was qualified for "Light to Light Medium" physical exertion at the time of the test. (AR 701-709). However, this test was conducted almost one year before the collapse of the C5-C6 plate in Plaintiff's neck, which required her to undergo a surgery which removed the C5-C6 plate, replaced it with donor bone, and fused her C6-C7 plates. (AR 408; 437-437). Even the Independent Physician Consultant retained by Defendant on appeal -- Dr. Marion -- noted that the test was conducted "approximately one year prior to her more recent cervical spine surgery" and consequently "may not be an accurate assessment of her current functional capacity." (AR 413). Thus, without any evidence demonstrating that Plaintiff regained her March 2008 physical capabilities following her May 2009 surgery, Defendant's decision to credit the March 2008 FCE is arbitrary.

Similarly, Defendant's post-hoc contention in its briefs that it considered the SSA's denial of benefits in making its determination is not only illogical for the same reason stated above -- the benefits were denied prior to Plaintiff's May 2009 surgery -- but is also inconsistent with its own analysis. While it is true that the SSA denied

17

Plaintiff's claim, it determined that she was qualified for "Sedentary" work. Defendant, however, uses this determination to support its claim that Plaintiff is ineligible for benefits because she is capable of "Light" work. The import of this distinction becomes obvious when Defendant asks the second question: "Is Plaintiff qualified for an appropriate job in this range of physical exertion?" Given Plaintiff's limited education and lack of work experience beyond physical labor, it is far more likely that she is qualified to perform a "Light work" job than a "Sedentary work" job. Thus, this initial categorization significantly affects the odds that Defendant will have to pay the claim. Defendant cannot use the SSA's determination that Plaintiff is capable of "Sedentary work" to support its conclusion that Plaintiff is capable of "Light work." Consequently, to the extent that Defendant relies on the SSA's decision to support its own denial of benefits, that reliance is also arbitrary.

The other evidence which purportedly supports Defendant's determination that Plaintiff is capable of Light work is an examination summary from Plaintiff's October 7, 2010 appointment with Dr. Sikorski. In this summary, Dr. Sikorski stated that "[s]he has good cervical range of motion with some increased pain with extension." (AR 447). This statement, even taken in context with the report's other positive physiological observations, provides no information about the Plaintiff's ability to perform various levels of work following surgery. Further, it ignores other negative observations in the report, such as "she is experiencing a little bit more weakness in the upper extremities, and she feels that she is dropping objects" and that she gets "associated numbness and

18

tingling." (AR 447). But setting the selective citation aside, the crucial point is that this report contains no indication as to whether Plaintiff is capable of "Light work" as defined by the U.S. Department of Labor. The phrase "good cervical range of motion with some increased pain with extension" does not, for example, tell a rational observer how much weight Plaintiff can lift and with what frequency.

Such information was provided, however, in two reports that Defendant ignored in its analysis. The first, an examination of Plaintiff by Dr. Kurz on May 11, 2010, stated that "[Plaintiff] is 13-months off surgery and she has on and off neck pain. It is really not a lot better in the last few months." (AR 466). Dr. Kurz then (i) restricted Plaintiff from returning to her job as a baggage handler and (ii) counseled that Plaintiff was only physically capable of "Limited bending, stooping, lifting" and "No over shoulder work." (AR 472).

Although this is the only opinion given by either of Plaintiff's physicians that addresses the elements of "Light work" or "Sedentary work," Defendant does not even address this opinion in its decision. When compared to the definitions of "Light work" and "Sedentary work," the relevance of Dr. Kurz's restrictions becomes apparent.

As noted, Dr. Kurz restricted Plaintiff to "Limited bending, stooping, lifting" and "No over shoulder work." (AR 472). In contrast, the Department of Labor defines "Light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with *frequent lifting or carrying* of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a

19

good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b) (emphasis added).

In contrast to Dr. Kurz's restriction of "limited lifting," "Light work" requires "frequent lifting or carrying of objects weighing up to 10 pounds" and additional lifting of up to 20 pounds. The inapplicability of the "Light work" categorization to Plaintiff's claim is unmistakable when Dr. Kurz's restrictions are compared to the definition of "Sedentary work":

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

"Occasional lifting or carrying of articles like docket files, ledgers, and small tools" appears significantly better aligned with Dr. Kurz's restrictions than the "frequent lifting or carrying of objects weighing up to 10 pounds" contemplated in the "Light work" classification. Given that Dr. Kurz's opinion was the only medical evidence directly addressing such criteria, Defendant's decision to completely ignore that opinion can only be seen as arbitrary and capricious. This is particularly true in light of the fact that Defendant also ignored Dr. Kurz's October 17, 2010 statement -- issued ten days after Dr. Sikorski's "good cervical range of motion" statement -- which confirmed that Plaintiff's

20

cervical motion remained "unchanged."  (AR 446).  Thus, viewing the "quality and quantity of the medical evidence and the opinions on both sides of the issues," *McDonald v. W.-S. Life Ins. Co.*, 347 F. 3d 161, 172 (6th Cir. 2003), as this Court must, this evidence does not provide a reasonable basis for deciding that Plaintiff is capable of "Light work" instead of "Sedentary work."

Because the preliminary question of Plaintiff's physical capacity was determined arbitrarily, Defendant's subsequent determination that Plaintiff was qualified and capable of obtaining appropriate employment -- and therefore ineligible to continue receiving benefits -- is likewise arbitrary.  Thus, the question now becomes whether Defendant's review of Plaintiff's case on appeal revealed sufficient evidence for this Court to determine that Defendant's decision to uphold its denial of LTD benefits was not arbitrary and capricious as well.


**2.      Defendant's Denial of Plaintiff's LTD Benefits on Appeal was Arbitrary because it Continued to Disregard Dr. Kurz's Opinion in Favor of Arbitrary and Discredited Evidence Supporting its Decision to Deny Benefits**

Although Defendant retained the opinions of an Independent Physician Consultant and a second Vocational Rehabilitation Consultant, both Defendant and its experts continued to ignore evidence indicating that Plaintiff could not perform Light work.  Specifically, Defendant and its experts (i) continued to ignore Dr. Kurz's May 11, 2010 restrictions that required "Limited bending, stooping, lifting"; (ii) initially ignored, and

21

later downplayed, Dr. Kurz's March 15, 2011 prohibition on jobs requiring prolonged neck flexion (AR 422); and (iii) completely ignored Dr. Sikorski's recommendation that Plaintiff undergo another Functional Capacity Evaluation ("FCE"). (AR 374). Because Defendant failed to adequately credit contradictory evidence in making its determination, its subsequent affirmance of its denial of LTD benefits was arbitrary. "As a general rule, an administrator abuses its discretion when it engages in a selective review of the administrative record to justify a decision" to deny coverage. *Dockery*, 2009 WL 2960471, at *11 (internal quotations omitted).

To evaluate Plaintiff's appeal, Defendant turned the medical file over to Dr. Marion, an Independent Physician Consultant. Based solely on a review of Plaintiff's medical records -- he did not physically examine Plaintiff -- Dr. Marion concluded that the information "supports the permanent restriction of a light capacity occupation." (AR 412). However, his report ignored much evidence to the contrary, indicating that the record was not carefully scrutinized. *See Dockery*, 2009 WL 2960471, at *11 (Rosen, C.J.) ("while there is nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination . . . here the independent medical examiners . . . provide scarce indication that they actually scrutinized the medical records."). To begin with, while Dr. Marion cites Dr. Kurz's May 11, 2010 examination, he fails to make any reference to the restrictions placed on Plaintiff's physical activities, *i.e.*, "Limited bending, stooping, lifting. No over shoulder work." (AR 411); (*see* AR 472). As discussed, this was the only post-surgery evidence in the record that expressed

22

Plaintiff's physician's opinion on her ability to perform specific physical tasks.  Without this information, the import of Dr. Kurz's October 19, 2010 examination, in which Dr. Kurz revealed that Plaintiff had not changed at all physiologically since the May 11 examination, *compare* AR 446 *with* AR 466, would be lost in Dr. Marion's analysis.

Although Dr. Marion appears to have credited Dr. Kurz's observation that Plaintiff "can not tolerate 'prolonged activities,'" (AR 411), his eventual recommendation does not appear to assign any weight to that conclusion either, even though Dr. Kurz's observation complemented his earlier restriction of "Limited bending, stooping, lifting.  No over shoulder work."  With this information clearly presented on the record, Dr. Marion summarily concluded that Plaintiff was capable of Light physical exertion, which included: "Lifting: 20 pounds occasionally and 10 pounds *frequently*"; "Bending, squatting, Twisting: Occasionally"; and "Carrying: 20 pounds occasionally and 10 pounds *frequently*."  (AR 412) (emphasis added).  Thus, without even conducting a physical examination of the patient, Dr. Marion reached his conclusion without accounting for the explicit restrictions placed on Plaintiff's physical activity by her own physician.

Further, his recommendation made no reference to Plaintiff's ability to perform "over shoulder work," which was completely forbidden by Dr. Kurz's report, (AR 471), and stated that there was "no evidence of cervical radiculopathy."  (AR 412).  The fact that this final statement, "no evidence of cervical radiculopathy," was demonstrably false at the time it was written further calls into question the reliability of Dr. Marion's report.

23

According to his report, the most recent notes provided for review were taken by Dr. Sikorski on February 3, 2011.  However, when Plaintiff informed Defendant that it would be appealing its denial on March 15, 2011, it enclosed updated medical records through Plaintiff's March 15, 2011 examination with Dr. Kurz.  (AR 421-435).  In those records, Dr. Kurz clearly diagnosed Plaintiff as having a "cervical disc herniation" and stated that Defendant "cannot do the job as cable assembling because of prolong[ed] neck flexion." (AR 422).  But despite the fact that these records were submitted alongside Plaintiff's appeal, Dr. Marion indicated that the most recent were from February 3, which indicates that Plaintiff's most recent examinations were unavailable for his review.  In a separate report from March 15, 2011 -- submitted to Defendant on May 26, 2011 -- Dr. Kurz objectively diagnosed plaintiff with "low grade cervical radiculopathy."  (AR 372).

Thus, whether through his own oversight or through Defendant's failure to include all pertinent materials in the claim file, Dr. Marion was either unaware of Plaintiff's cervical disc herniation and Dr. Kurz's restriction against performing any work requiring neck flexion at the time of his report -- or he chose to ignore it.  When informed of Dr. Kurz's diagnosis, Dr. Marion supplemented his report to adopt the recommendation that "patient should not be required to perform prolonged neck flexion," but maintained that the rest of his recommendation was "without change."  (AR 405).  When Defendant was made aware on May 26, 2011, that Plaintiff had been diagnosed with "low grade cervical radiculopathy," it did not consult Dr. Marion.  Rather, one of Defendant's internal clinicians looked at the information and determined that it lacked "any new clinical

24

findings," "would not impact prior . . . review assessment," and that "[a]ddendum review

is not warranted."  (AR 355-356).

Nothing about Dr. Marion's eventual concurrence with Dr. Kurz's narrow

prohibition against work involving prolonged neck flexion remedies the arbitrary

conclusions contained in his initial report.  Even after evaluating the additional evidence,

Dr. Marion continued to maintain that Plaintiff was capable of "Light work," *i.e.*, capable

of frequently lifting and carrying between 10 and 20 pounds.  In the face of new

information indicating that Plaintiff could only bend her neck occasionally in the

performance of her job, Dr. Marion maintained that such constant lifting was within

Plaintiff's physical capabilities.  Further, this recommendation was maintained without

ever physically examining the Plaintiff and in direct contrast to the recommendations of

her physician, Dr. Kurz.  Absent any explanation for disregarding such adverse evidence,

Dr. Marion's conclusion must be considered arbitrary.

Lange, the second Vocational Rehabilitation Consultant, compounded the effect of

Dr. Marion's limited view of the evidence by adopting his analysis wholesale in her LMA

without any reference to the restrictions placed on Plaintiff's activity by her physician,

Dr. Kurz.  (*Compare* AR 381 *with* AR 412).  Consequently, because her analysis was

based on Dr. Marion's arbitrary conclusion that Plaintiff was capable of Light physical

exertion, her ultimate conclusion regarding Plaintiff's employability is also arbitrary.

The validity of Lange's LMA could be resurrected, however, if Defendant

demonstrates that its own review of the record -- independent from Dr. Marion's analysis

25

-- rationally concluded that Plaintiff is capable of Light work.  However, Defendant's June 17, 2011 letter denying Plaintiff's appeal, and its subsequent briefs urging this Court to uphold that denial, demonstrate that its decision was indeed arbitrary and capricious. The Supreme Court has found that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. at 834.  As with its original denial and Dr. Marion's analysis, Defendant does not even reference Dr. Kurz's restrictions of "Limited bending, stooping, lifting.  No over shoulder work" in its letter recapping Plaintiff's medical history and listing the reasons for denying LTD benefits.  It does, however, cite Dr. Marion's report for its conclusion that Plaintiff is capable of Light physical exertion.  This reliance fails, most obviously, because one cannot overcome a flaw in analysis by reference to a source suffering from the same flaw.  More specifically, Defendant cannot overcome its failure to address contrary evidence in the administrative record by substituting the conclusions of hired third-parties instead.  *See Dockery*, 2009 WL 2960471, at *11.  This is particularly true because Dr. Kurz examined the Plaintiff, while Dr. Marion -- Defendant's preferred authority -- did not.  *See Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) ("Whether a doctor has physically examined the claimant is indeed one factor that [this Court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

But, while Defendant's misplaced reliance on Dr. Marion's report and failure to properly account for Dr. Kurz's testimony -- although internally inconsistent and without rational basis -- are not necessarily indicative of bad faith, its final two errors are.  In support of its conclusion that Plaintiff can find a job requiring Light physical exertion, Defendant relied not only on Lange's report -- which erroneously relied on Dr. Marion's arbitrary conclusion -- but also cited Merline's discredited LMA, which Defendant knew to be incorrect.  (*See* AR 366-367).  As Lange's study stated: "a previous Employability Assessment was conducted by MetLife and alternate occupations such as wire assembler . . . , Electronics Assembler . . . , and Electronic Tester . . . were identified.  However, after further review, it was opined that these assembly occupations would require prolonged/frequent neck flexion, which would not be within Ms. Magdziak's restrictions.  Therefore a second analysis was requested."  (AR 382).

To make matters worse, Defendant continues to cite the Merline report in its briefing to this Court.  Def. Reply 2 ("As discussed in detail in MetLife's Motion to Affirm the Administrator's Decision . . . in reaching its decision MetLife considered, among other things . . . the reports of *two vocational consultants*") (emphasis added). Indeed, Plaintiff not only cites to the Merline report, but affirmatively represents that its recommended occupations remain valid to this day, asserting:

> Two vocational consultants, Renee Lange MS, CRC, with the CorVel Corporation, and James F. Merline MS, CRC -- taking into consideration Plaintiff's medical restrictions, education, and past work experience -- identified several light duty jobs that Plaintiff could perform: Wire Harness Assembler, Electronics Assembler, Electronics Tester, Riveting Machine

Operator, Machine Assembler and Nicking Machine Operator. Further, each of these vocational consultants noted that these occupations existed in reasonable numbers in Plaintiff's local labor market. *See* Merline Report, Exhibit N, AR 440-442, and Lange Report, Exhibit S, AR 381-383.

Def. Reply 5.

In addition to listing occupations from the Merline report, which it knew to be false, Defendant also included "Machine Assembler," even though both Lange and the Defendant recognize that this position is not suitable for an individual unable to engage in prolonged neck flexion. (*Compare id. with* AR 369) ("On June 14, 2011, the vocational rehabilitative consultant noted that while the position of machine assembly may have the potential for prolonged neck flexion, the positions of riveting and nicking machine operator were consistent with Ms. Magdziak's requirement for a neck flexion positioning restriction to more than an occasional basis."). Continued citation to, and reliance upon, recommendations that Defendant knows to be inapplicable, for the sake of supporting its denial of benefits, is certainly arbitrary if not a blatant demonstration of bad faith.

Finally, and perhaps most basically, Defendant abused its discretion by failing to request that Plaintiff undergo a second Functional Capacity Evaluation ("FCE") prior to adjudicating her claim. In retaining Dr. Marion as an Independent Physician Consultant, Defendant asked whether Plaintiff's 2008 FCE was "consistent with the clinical findings?" (AR 412). Although Dr. Marion answered that the "testing was valid" and the "FCE determination was consistent with the clinical findings," he made it a point to note that the results may not be reliable, stating: "this FCE was performed in 2008 which was

28

approximately one year prior to her more recent cervical spine surgery in 2009.  The 2008 FCE may not be an accurate assessment of her current functional capacity."  (AR 413). This statement questioning the validity of one of the two bases for Defendant's original denial of Plaintiff's LTD benefits -- if its validity was not already obviously in question -- should have immediately prompted a follow-up FCE to conclusively determine Plaintiff's actual ability to perform physical labor.  Instead, Defendant did not even acknowledge the inapplicability of the test in its letter affirming the denial of Plaintiff's LTD benefits.

Worse yet, armed with the knowledge that its earlier test may be inapplicable, Defendant generously quotes positive information from Dr. Sikorski's March 9, 2011 examination of Plaintiff, but *does not mention* that Dr. Sikorski recommended that Plaintiff "will probably need another functional capacity evaluation."  (*Compare* AR 374 *with* AR 368).  Such an evaluation would have definitively determined Plaintiff's post-surgery physical capacity and allowed Defendant to evaluate Plaintiff's employability from a solid foundation.  Rather than follow this route, however, Defendant chose to continue its reliance on the March 2008 FCE -- which it submitted to Dr. Marion and specifically asked him to validate -- so it could evaluate Plaintiff's employability in a sector of the economy more suited to her experience and education, thereby increasing the odds of identifying potential employment opportunities and denying her LTD benefits.

In sum, Defendant's entire review process -- from the initial handling of Plaintiff's post-36 month LTD benefits claim through the appeal -- appears to have been a result-oriented, slapdash affair designed only to ignore inconvenient facts and reach a pre-

ordained objective of denying Plaintiff's claim.  Indeed, the Defendant's reasoning and decision in this case are precisely the type that courts have cautioned require particular vigilance toward in their review when Defendant is, as here, in a potential conflict of interest situation.  Defendant's review process here is clearly not consistent with a conclusion that Defendant reached its decision as the result of a "deliberate, principled reasoning process." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2003).  Consequently, Defendant's denial of LTD benefits must be reversed.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion to reverse the administrator's decision is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for entry of judgment affirming the plan administrator's decision is DENIED, and that this case be REMANDED to Metropolitan Life Corporation to (i) perform a Functional Capacity Evaluation to determine Plaintiff's physical capabilities and (ii) provide a full and fair review of Plaintiff's long-term disability benefits claim.

Dated:  February 5, 2013                    S/Gerald E. Rosen_____
                                             Chief Judge, United States District Court

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 5, 2013, by electronic and/or ordinary mail.

                                        S/Julie Owens_____
                                        Case Manager